IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

JOSEPH TAMBORELLO,

Defendant.

Case No. CR10-0028

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

*I.   INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . 1

*II.  PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . 1

*III. RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . 2

*IV.  DISCUSSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A.   Did Defendant Have a Reasonable Expectation of Privacy?* . . . . . . . . 5
    *B.   Was the Warrantless Search Violative of the Fourth Amendment?* . . . . 7

*V.   RECOMMENDATION.* . . . . . . . . . . . . . . . . . . . . . 11

*I. INTRODUCTION*

On the 2nd day of July 2010, this matter came on for hearing on the Motion to Suppress Evidence (docket number 16) filed by the Defendant on June 23, 2010. The Government was represented by Assistant United States Attorney Robert L. Teig. Defendant Joseph Tamborello appeared personally and was represented by his attorney, Stephen A. Swift.

*II. PROCEDURAL HISTORY*

On April 21, 2010, Defendant Joseph Tamborello was charged by Indictment with one count of being a felon in possession of firearms. Defendant appeared on May 27,

2010 and entered a plea of not guilty. The matter was set for trial before Chief Judge Linda R. Reade on July 26, 2010.

On June 23, Defendant timely filed the instant motion to suppress evidence. The Government filed its response on June 28. An evidentiary hearing was held on July 2.

Immediately prior to the hearing on the motion to suppress, the Court was advised that it was likely Defendant would be entering a conditional plea of guilty to the charge, reserving those issues raised in the motion to suppress. Defendant subsequently appeared on July 9 and conditionally pleaded guilty to the indictment.

## III. RELEVANT FACTS

Shortly before 5:00 a.m. on April 5, 2006, Cedar Rapids Police Officer Thaddeus Paisar responded to a residence on Mallory Street SW in Cedar Rapids. Paisar was told by the dispatcher that a person called the police department indicating that he wanted to be committed to the hospital. Upon arrival at the scene, Paisar found Defendant standing in the middle of the roadway, waving him down.

Officer Paisar exited his squad car and approached Defendant. Defendant advised Paisar that he was wearing Kevlar body armor. At Paisar's request, Defendant removed his hands from his pockets. When Paisar patted Defendant down, he did not find any weapons, but could feel the body armor.

Defendant told Officer Paisar that he was feeling suicidal and wanted to go to the hospital. Specifically, Defendant told Paisar that he wanted to commit "suicide by cop." As Paisar was walking Defendant to the squad car, Defendant started to become more agitated and "started again talking about suicide by cop and killing people." Defendant started to walk away, removing his jacket and his body armor.

Following the arrival of backup, the officers were able to talk to Defendant, calm him down, and place him in the back of a squad car. At that point, Defendant told the officers that there were two children in the house, whom he believed were approximately nine years old. Defendant told Officer Paisar that there were no other adults in the residence. Paisar could not recall asking Defendant additional details regarding the

children, such as the identity of their parents or the phone number of a responsible adult. Paisar then transported Defendant to the hospital, where he was voluntarily committed.

Cedar Rapids Police Officer Michael Fetters testified that he was one of the officers who appeared on the scene as backup.[1] Fetters confirmed that in speaking with Defendant, the officers learned that there were two young children inside the residence. Defendant told the officers that "they were sleeping and that he did not want us to bug them." After Defendant was removed from the scene, it was decided to check on the welfare of the children. Officers knocked on the front door, but did not receive any response. They then contacted the dispatcher in an attempt to get a phone number associated with the residence, but were unsuccessful. Officers then knocked on the door again. After receiving no response, and finding the door unlocked, the officers entered the house and announced their presence as "Cedar Rapids Police Department." After receiving no response, the officers started looking through the residence to locate the children.

Two boys, ages 11 or 12, were found sleeping in a bedroom on the first floor. Officers woke them and determined that they were unharmed. A third boy, described as a "teenager," was found sleeping in an upstairs bedroom. No adults were found in the house.

The boys found in the downstairs bedroom told the officers that Defendant "had went crazy" earlier. The officers were told that Defendant came into the bedroom – while the boys were still awake – and attempted to load shotguns and talked about suicide by cop. Officers found guns in the bedroom, although Officer Fetters could not remember "if they showed us or if we actually saw it."

Joseph Kuba testified that in April 2006, he resided at the residence where the incident occurred. At that time, Kuba lived at the house with his four grandsons, ages 16, 14, 11, and 7. Kuba's wife was living with her parents, apparently due to health problems. Kuba's daughter, Michelle, was also living with Kuba's in-laws. According

---

[1] Fetters was a Cedar Rapids police officer at the time, but has since retired on medical disability.

3

to Kuba, he and his wife had "basically unofficial custody" of the children and the boys regularly stayed with him.[2]

Defendant and Michelle had been dating, but were "split up" prior to April 2006.[3] According to Kuba, there was a "no contact" order in place. Michelle and Defendant had previously been renting the house immediately next door to Kuba's residence. Kuba testified that Defendant was living in the residence next door at the time of the incident on April 5, 2006. On cross-examination, Kuba acknowledged that Defendant had lived in Kuba's house during the prior summer and left some personal property there, but testified that Defendant was not living there in April 2006 and did not have Kuba's permission to stay at the residence. The guns found in the house belonged to Kuba.

Kuba testified that he was employed at a locker in Newhall and had left for work at 4:00 or 5:00 p.m. on the previous afternoon. Kuba thought that one of the boys was going to spend the night with a friend, with the other three boys spending the night with Michelle at Kuba's wife's parents' house.[4] That is, Kuba did not believe that any of the boys were staying there that night. Kuba testified that he generally got home at 2:00 or 3:00 in the morning, but he had no explanation as to why he was not home when these events occurred shortly before 5:00 a.m.

## IV. DISCUSSION

Defendant argues that the warrantless search of the house, and subsequent seizure of the weapons, was violative of the Fourth Amendment. The Government argues that in entering the house, the officers were performing their "community caretaking functions," and did not violate the Fourth Amendment. Furthermore, the Government argues that Defendant lacked a reasonable expectation of privacy in Kuba's residence.

---

[2] Michelle is the mother of all four boys who were living with Kuba.

[3] While the record is imprecise, Defendant is apparently not the father of any of the four boys.

[4] One of the boys found in the downstairs bedroom was Kuba's grandson, and the other boy was the friend with whom Kuba believed the grandson was staying that night.

4

## A. Did Defendant Have a Reasonable Expectation of Privacy?

Preliminarily, the Court addresses the issue of whether Defendant had a reasonable expectation of privacy in the property that was searched. The Government argues that Defendant "had no reasonable expectation of privacy in the bedroom where the guns were found." Defendant argues that his "standing" to challenge the search is established by his "long term connection with members of this family" and the fact that he had personal property stored at the residence.[5]

The Fourth Amendment to the United States Constitution protects persons "against unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*,

---

[5] There is some confusion regarding whether Defendant's entitlement to challenge the search is properly referred to as "standing." In *United States v. Gomez*, 16 F.3d 254 (8th Cir. 1994), the Eighth Circuit Court of Appeals found that the defendant had no expectation of privacy in the vehicle searched, citing *Rakas v. Illinois, 439 U.S. 128 (1978)*, and, therefore, had "no standing to challenge the legality of the search." *Id.* at 156. However, in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court was critical of the Minnesota Supreme Court for analyzing the issue as one of "standing."

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas*, 439 U.S., at 139-140, 99 S.Ct. 421.

*Id.* at 87. The Court noted that in *Rakas*, it found that the "definition of those [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* at 88 (quoting *Rakas*, 439 U.S. at 140). The Eighth Circuit Court of Appeals discussed this change in *United States v. Sturgis*, 238 F.3d 956 (8th Cir. 2001).

> Two Terms ago, the Supreme Court reaffirmed its earlier rejection of "standing" nomenclature. *Minnesota v. Carter*, 525 U.S. 83, 87-88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Beginning in *Rakas v. Illinois*, 439 U.S. 128, 139-140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and continuing in *Carter*, the Court replaced the standing inquiry with a new vocabulary tailored to the principles that undergird the Fourth Amendment. *See Carter*, 525 U.S. at 88, 119 S.Ct. 469. In *Carter*, the Court declared that "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable ..." *Id.*

*Id.* at 958. Accordingly, the issue is not one of "standing," but rather one of substantive Fourth Amendment law and whether Defendant had a reasonable expectation of privacy.

445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)).

Rights conferred by the Fourth Amendment "are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). That is, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134. However, "in some circumstances a person may have a legitimate expectation of privacy in the house of someone else." *Minnesota v. Carter*, 525 U.S. 83, 89 (1998). For example, an overnight guest has a legitimate expectation of privacy in his host's home. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). Accordingly, the Court must determine whether Defendant had a reasonable expectation of privacy in Kuba's residence. Defendant has the burden of proof in this regard. *Rakas*, 439 U.S. at 130-31 n.1.

The testimony here established that Defendant was not living at the Kuba residence when it was searched on April 5, 2006. Kuba's daughter, Michelle, and Defendant were renting the house next door, and Kuba testified that Defendant was residing there in April 2006.[6] Kuba acknowledged that Defendant lived at Kuba's house during the prior summer and left some personal property there. Kuba testified, however, that Defendant was at Kuba's house that night without Kuba's knowledge or permission, and Defendant was not entitled to "stay" or "live" at the house. Defendant last stayed overnight at the Kuba house some seven or eight months prior to the search.

In support of his argument, Defendant cites cases from the First and Sixth Circuits. In *United States v. Weidul*, 325 F.3d 50 (1st Cir. 2003), the Court granted the defendant's motion to suppress a firearm seized during a warrantless search of his girlfriend's home.

---

[6] Apparently, Michelle left the residence which she shared with Defendant following an assault and the entry of a no contact order.

In that case, however, "[i]t [could] be inferred from the record that Weidul was staying or living with Malloch. Therefore, he had an expectation of privacy in her home and standing to challenge the warrantless search." *Id.* at 52 n.1 (citing *Minnesota v. Olson*). Similarly, in *United States v. Pollard*, 215 F.3d 643 (6th Cir. 2000), the Court concluded that one of the defendants had "standing" to contest the search because he was long-time friends of the lessee, had been staying at the home earlier in the week, and "occasionally spent the night at the residence and kept some personal belongings in a closet in the living room." *Id.* at 647. The Court further concluded, however, that another defendant lacked standing to contest the search because he was a "mere visitor" to the residence. *Id.* at 648.

I believe that *Weidul* and *Pollard* are both distinguishable on their facts from the instant action. As set forth above, Weidul was "staying or living" at his girlfriend's residence and, therefore, fell directly under the Supreme Court's holding in *Minnesota v. Olson*. Pollard was a frequent visitor to his friend's house, occasionally spent the night at the residence, and had been staying at the home earlier in the week. By contrast, Defendant in the instant action had not stayed at Kuba's house for at least seven months. Furthermore, Kuba specifically testified that Defendant was not entitled to stay or live at his house. *See United States v. Davis*, 103 F.3d 660, 671 (8th Cir. 1996) (finding that the defendant did not have a legitimate expectation of privacy in the apartment searched when he neither lived at the address nor "was a guest in the home at the time of the search").

I believe that Defendant in this case could have no reasonable expectation of privacy in the Kuba residence or its contents. Accordingly, Defendant lacks a Fourth Amendment right to contest the validity of the warrantless search of the Kuba residence on April 5, 2006. Defendant's motion to suppress should be denied on that ground.

### B. Was the Warrantless Search Violative of the Fourth Amendment?

As set forth above, I believe that Defendant did not have a reasonable expectation of privacy in the Kuba residence and, therefore, may not challenge the validity of the warrantless search. That is, I believe the district court need not address the substantive issue of whether the warrantless search violated the Fourth Amendment. In the event the

district court disagrees with my analysis, however, I will address the Fourth Amendment issue.

It is well-established that a search within a home without a warrant is presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The government has the burden of overcoming the presumption of unreasonableness that attaches to all warrantless home entries. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). The government can meet this burden by establishing exigent circumstances which "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). For example, "[e]xigent circumstances are present where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008). In this case, the Government argues that exigent circumstances existed, justifying a warrantless search to protect the public safety. In a similar argument, the Government asserts that the warrantless search was authorized under the officers' "community caretaking functions."

The Eighth Circuit Court of Appeals has held repeatedly that a "legitimate concern for the safety of individuals" may constitute exigent circumstances, justifying a warrantless entry. *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1028 (8th Cir. 2007); *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004); *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989). Accordingly, when investigating a crime, officers may enter a home without a warrant upon a showing of probable cause and a legitimate concern for the safety of individuals.

Similarly, officers may enter a house without a warrant, even when not investigating a crime, if he or she has a reasonable belief that an emergency exists which requires his or her attention. In *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Supreme Court recognized that law enforcement officers are frequently involved in activities which are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. The Court described these activities as

"community caretaking functions." The Eighth Circuit Court of Appeals noted in *United States v. Quezada*, that a different standard applies to a warrantless entry by officers performing a community caretaking function, as opposed to a warrantless entry by officers investigating criminal activity.

> We note at the outset that there is a difference between the standards that apply when an officer makes a warrantless entry when acting as a so-called community caretaker and when he or she makes a warrantless entry to investigate a crime. Police officers, unlike other public employees, tend to be "jacks of all trades," who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law. *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). These activities, which are undertaken to help those in danger and to protect property, are part of the officer's "community caretaking functions." *Id.* They are unrelated to the officer's duty to investigate and uncover criminal activity. A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention. *Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *United States v. Nord*, 586 F.2d 1288, 1291 n.5 (8th Cir. 1978).
>
> When acting to investigate and uncover crime, on the other hand, a police officer acts at the core of his or her duties; it is to these types of actions that the warrant clause of the fourth amendment is directed. *See Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). A warrantless entry in such circumstances must be justified by probable cause to believe that a crime has been or is being committed and the existence of what are called exigent circumstances. Examples of such circumstances are when an officer is in hot pursuit of a fleeing felon, and when an officer reasonably fears the imminent destruction of evidence or reasonably perceives a risk of danger to the police or others. *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

> The Supreme Court has held that reasonable belief, the standard used when determining whether an officer may enter as a community caretaker, *see Mincey*, 437 U.S. at 392-93, 98 S.Ct. 2408, is a less exacting standard than probable cause. *Maryland v. Buie*, 494 U.S. 325, 336-37, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

448 F.3d 1005, 1007 (8th Cir. 2006).

I believe that this case is properly analyzed under the "community caretaking" standard of whether the officers had a "reasonable belief" that a warrantless entry was necessary to provide for the safety of children in the residence. The officers were confronted with an individual wearing body armor, acting erratically, and threatening "suicide by cop." Defendant told the officers that there were two nine-year-old boys in the house, without adult supervision. Because of Defendant's erratic behavior, a reasonable officer could have been concerned regarding the children's well-being. That is, it was possible that Defendant had harmed the children prior to calling authorities. Alternatively, the officers could have reasonably believed that there was a weapon in the house and allowing the weapon to remain with two unsupervised nine-year-old boys could be dangerous. At that time, Defendant had been taken to the hospital and it was unknown when an adult would return home. Arguably, if the officers had left the scene without checking on the children or attempting to safeguard their well-being, the officers would have been derelict in their duty.

It is significant that the officers restricted their search to that necessary to safeguard the children. Officers knocked on the front door, but did not receive any response. After unsuccessfully attempting to obtain a phone number associated with the residence from the dispatcher, officers knocked on the door again. It was only after the officers were unsuccessful in their attempts to contact the occupants of the house that they entered without a warrant. Initially, officers entered the house and announced their presence as "Cedar Rapids police department." Because they received no response, officers started searching the residence to locate the children. There is no evidence that the officers looked in drawers or cupboards or other places where children would not be located. The

guns were found in the bedroom with the two boys, although the record is imprecise regarding whether they were in plain view, or if the boys produced them to officers.

In summary, the Court concludes that the officers had a reasonable belief that a warrantless entry into the house was necessary to check on the welfare of the children and ensure their safety.[7]

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **DENY** the Motion to Suppress Evidence (docket number 16) filed by the Defendant on June 23, 2010.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on July 2, 2010.*

DATED this 15th day of July, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[7] The Government argues further that even if the search was otherwise unlawful, the officers acted in good faith and, therefore, the exclusionary rule should not be applied. *See Herring v. United States*, ___ U.S. ___, 129 S. Ct. 695, 698 (2009). I believe that it is unnecessary for the district court to address this issue.